IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BIOPOINT, INC. <br>            Plaintiff, <br><br> vs. <br><br> LEAH ATTIS, ANDREW DICKHAUT and <br> CATAPULT STAFFING LLC d/b/a CATAPULT <br> SOLUTIONS GROUP <br>            Defendants. | CIVIL ACTION NO. 1:20-CV-10118-RGS |

## AMENDED COMPLAINT AND JURY DEMAND

### Parties

1.   Plaintiff BioPoint, Inc. ("BioPoint") is a Massachusetts corporation with its principal place of business in Wakefield, Massachusetts.

2.   Leah Attis ("Attis") is an individual who on information and belief resides in Leominster, Massachusetts.

3.   Andrew Dickhaut ("Dickhaut") is an individual who on information and belief resides in Leominster, Massachusetts.

4.   Defendant Catapult Staffing LLC d/b/a Catapult Solutions Group ("Catapult") is a Texas limited liability company with its principal place of business in Plano, Texas.

### Jurisdiction and Venue

5.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this matter involves claims arising under federal law.

6.   This Court has supplemental jurisdiction over the Massachusetts state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so related to claims in this action within the Court's subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

B5086757.4

7.   This Court has personal jurisdiction over Attis and Dickhaut because they reside in Massachusetts and over Catapult because it does business and maintains an office in Massachusetts.

8.   Venue is proper in the District Court of Massachusetts pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

<u>Facts</u>

<u>BioPoint and its Proprietary and Confidential Information</u>

9.   Founded in 2011, BioPoint provides consulting services and workforce solutions to clients in the life sciences (*e.g.*, pharmaceutical, biotechnology, and medical device) industry.

10.   BioPoint partners with clients to provide them specialized expert consultants in areas including drug safety and risk management, regulatory affairs services, quality assurance consulting, clinical operations and biometrics, and clinical development.

11.   Clients hire BioPoint because of its ability to quickly identify and provide high-quality consultants who have unique expertise necessary for clients' particular projects.

12.   All of BioPoint's revenue comes from the fees it collects from clients for its consultants' services.

13.   BioPoint has invested considerable time and resources in developing its pool of qualified consultants and in building and maintaining its client relationships.

14.   BioPoint's consultant and client information are its most valuable and important assets.

15.   BioPoint uses a database called Crelate to track prospective and current consultant placements and information about its clients. The database includes data relating to BioPoint's

2

communications with consultants and clients, internal notes, consultants' credentials, reference checks, and contracts. Access to this database is restricted to BioPoint's employees via a username and password.

16.    BioPoint also provides its employees with other confidential information relating to its sales efforts, such as account lists, pricing for services, contract terms and arrangements, volume of sales by client and employees, and client-specific know-how collected in the field. This information, as well as the data in Crelate, constitutes a trade secret.

17.    BioPoint protects its confidential and proprietary information, in part, by limiting access to employees and requiring that employees sign confidentiality agreements agreeing never to disclose or share its information.

### Leah Attis

18.    In or around May 2015, BioPoint hired Defendant Attis for the role of Business Development Manager. At the time, Attis did not have prior experience selling life sciences consulting services.

19.    Attis's responsibilities involved developing and maintaining relationships with BioPoint's clients, including understanding clients' business needs, recommending applicants for consulting services, and providing ongoing services during the consultancy arrangement.

20.    As a condition of employment, on May 29, 2015, Attis executed a Non-Solicitation, Non-Competition, and Confidentiality Agreement (the "Agreement"). A copy of the executed Agreement is attached hereto as Exhibit A.

21.    BioPoint's offer of employment to Attis and Attis's acceptance of that offer and all of its terms constitutes adequate consideration for the Agreement.

B5086757.4

22.     Among other legitimate business interests, the Agreement protects BioPoint's valuable proprietary and confidential information and goodwill.  The Agreement provides that BioPoint is sharing its confidential information with Attis only by virtue of its employment relationship with her, and that this information is of great value to BioPoint.

23.     Section 1.2 of the Agreement provides:

Employee agrees that Employee will not disclose, divulge or use in any manner any such Confidential Information except as specifically required in the performance of Employee's duties, and that Employee will not, under any circumstances, communicate any such Confidential Information to anyone not employed by the Company and/or specifically authorized by the Company to receive such Confidential Information.  It is expressly agreed that the foregoing restrictions upon use, disclosure or communication of the aforementioned Confidential Information shall be in full force and effect forever and shall survive any termination of Employee's employment with the Company....

Exhibit A.

24.     Confidential information under the Agreement includes, but is not limited to: applicant information, placement opportunities with clients, placement files, computerized databases of applicants, clients and positions, proposals and contracts, and names of customers or potential customers.  Exhibit A at Section 1.1.

25.     Further, the above obligations extend to confidential information belonging to BioPoint's customers, applicants, suppliers or licensees to the extent BioPoint has undertaken any obligations with respect to the confidentiality to such persons, firms or entities.  Id. at Section 1.2

26.     The Agreement also requires that upon termination Attis must deliver to BioPoint all confidential information in her possession, and if requested to do so, must certify in writing that she has returned all such confidential information to BioPoint.  Id.

27.     Additionally, in light of Attis's close association with BioPoint's clients and consultants and her access to its confidential information, Attis also agreed that she would not during the term of her employment or for one year thereafter:

- "solicit, perform or engage in any business of the same or similar nature to that business of the Company…";

- "…divert ... any business of the same or similar nature to the business of the Company with or from any customer or potential customer of the Company";

- "induce or attempt to induce any customer of the Company to reduce such customer's business with the Company or divert such customer's business from the Company";

- "solicit, engage in any business with, place or attempt to place in any position any of the applicants of the Company";

- "induce, entice away, solicit or in any manner persuade or attempt to persuade any applicant of the Company to terminate or limit said applicant's relationship with the Company";

- "take any action prejudicial to the Company or its business affairs or interests"; or

- "assist any person, firm, entity, employer, business associate or member of Employee's family to commit any of the foregoing acts."

Id. at Section 3.2

28.     Attis agreed that a breach of the foregoing covenants could cause BioPoint irreparable injury for which it could seek specific performance or other remedies available, including monetary damages.  Id. at Section 4.1.

5

29.     Attis occupied a position of trust and confidence while employed at BioPoint.

**Defendants Dickhaut and Catapult**

30.     Prior to working at BioPoint, Attis worked at Disys Intelligence Systems, LLC ("Disys"), an information technology staffing firm.  Upon information and belief, Attis worked at Disys with Defendant Dickhaut.

31.     Upon information and belief, Attis and Dickhaut are engaged to be married.

32.     Defendant Catapult is in the business of providing consulting services and workforce solutions.

33.     Until 2019, BioPoint did not consider Catapult to be a competitor, because Catapult did not advertise selling life sciences consulting services, nor did it have an office in Massachusetts.

34.     Upon information and belief, in August 2017, Catapult hired Dickhaut as a Managing Director.

35.     Attis represented to BioPoint that when Catapult hired Dickhaut, his role would be focused on information technology, not life sciences consulting.

36.     In March 2019, while accompanying Attis as her significant other at a BioPoint event, Dickhaut solicited one of BioPoint's employees, offering to triple his salary if he would come work for Catapult.

37.     In September 2019, Catapult registered its business to operate in Massachusetts. The only local manager listed in Catapult's corporate registration filed with the Massachusetts Secretary of State is Angelo Salustri, who, upon information and belief, was hired by Catapult in March 2018.

38.     Upon information and belief, Salustri formerly worked with Attis and Dickhaut at Disys, and they are all personal friends.

39.     In or around November 2019, Salustri became the President of Catapult's life sciences division.

40.     Presently, Catapult's website lists life sciences consulting as one of its core service areas.  Catapult's description of its life sciences services on its website is nearly identical to BioPoint's description of its own services on BioPoint's website.

**Attis Shares BioPoint's Confidential Information with Dickhaut and Catapult**

41.     On multiple occasions, Attis has surreptitiously sent Dickhaut BioPoint's confidential and proprietary information relating to its business.

42.     For example,

a.     In September 2017, a contact at one of BioPoint's prospective clients introduced Attis, via email, to its Head of Regulatory Affairs in order for Attis to make placements in that person's department. Attis forwarded this email Dickhaut.  The next day, Attis sent an email to Dickhaut detailing BoioPoint's core service offerings to its clients.

b.     In July 2018, Attis forwarded BioPoint's supplier agreement with one of its clients to Dickhaut.

c.     In November 2018, Attis received her monthly commission report containing proprietary client and consultant information.  She forwarded this report to Dickhaut.

d.     In April 2019, Dickhaut asked Attis her opinion on a potential consultant, and Attis disclosed information about that consultant's qualifications.

7

e.   In September 2019, Attis asked Dickhaut for a draft communication he had prepared for his clients, disclosing to him that an issue addressed in that communication was occurring with BioPoint's clients.

43.   On at least two occasions, Attis emailed Dickhaut potential leads for placing consultants. Neither of these leads related to roles for information technology services; both related to positions in the life sciences industry.

44.   Additionally, BioPoint has identified several consultants whom BioPoint was actively attempting to place with its clients, but who Catapult ended up placing instead.

45.   Upon information and belief, Attis shared information about these consultants with Dickhaut, enabling Catapult to secure contracts that BioPoint was soliciting itself.

46.   For example,

a.   On or about December 6, 2017, a BioPoint recruiter was attempting to place a consultant with one of its pharmaceutical company clients.  About two weeks later, a prospective client contacted Attis about initiating a contract for this consultant at his company.  Attis, however, never notified anyone at BioPoint of the opportunity.  Upon information and belief, Attis shared information about this opportunity with Dichkaut, and a few weeks later Catapult placed this consultant with this prospective client, even though the opportunity was offered to Attis and BioPoint first.

b.   In or around May 2018, a BioPoint recruiter added a consultant to BioPoint's proprietary database, Crelate.  Upon information and belief, Attis shared information about this consultant with Dickhaut, and later that month, Catapult

8

placed this consultant at BioPoint's prospective client, Vedanta Biosciences, Inc. ("Vedanta").

c.   In or around December 2018, a BioPoint recruiter was trying to place a consultant with one of BioPoint's clients.  The consultant, who had expressed interest in BioPoint's offer, said that he had accepted a position with a biotech company in Cambridge.  This company turned out to be Vedanta.  Upon information and belief, Attis shared information about this consultant with Dickhaut, and he and Catapult placed this consultant at Vedanta.

d.   In or around March 2019, a BioPoint recruiter sent Attis a consultant's resume for a position with one of BioPoint's clients. Attis never responded to the recruiter about pursuing this placement. Upon information and belief, Attis shared information about this consultant with Dickhaut, and he and Catapult then placed this consultant at Vedanta a few months later.

### Attis Forfeited a Business Opportunity with BioPoint's Prospective Client Vedanta; Catapult Then Secured a Valuable Contract with Vedanta

47.   Upon information and belief, in or around February 2018, one of Attis's longtime client contacts in talent acquisition took a position with BioPoint's prospective client, Vedanta. This presented a new opportunity for BioPoint to secure business with this prospective client.

48.   Starting in 2018, Attis represented to BioPoint's partners that she was attempting to secure new business for BioPoint with Vedanta.

49.   However, Attis was secretly helping Dickhaut secure Vedanta as Catapult's client.

50.   In January 2019, Attis assisted Dickhaut in preparing a pitch for Catapult to become Vedanta's Managed Service Provider ("MSP").  An MSP is responsible for all staffing for a particular client.  Attis edited and commented on Dickhaut's draft pitch document.  She also

9

offered to provide Dichkaut a presentation given to BioPoint from one of its partners, which BioPoint had committed it would not share.

51.     Upon information and belief, Catapult secured the MSP contract with Vedanta in early 2019.

52.     In April 2019, Attis made a proposal to the BioPoint partnership that BioPoint contract with Catapult to provide it Vedanta's life sciences consultants.

53.     BioPoint rejected Attis's proposal.  BioPoint did not want to forego a potential direct relationship with Vedanta, and it did not want to share BioPoint's proprietary and confidential information relating to its consultants with Catapult.

54.     Thereafter, BioPoint has not been able to secure a contract with Vedanta.

**BioPoint Loses a Valuable Contract to Catapult**

55.     On March 11, 2019, Dickhaut emailed Attis a job description for a position that Catapult was trying to fill for Vedanta.  In or around March 2019, Attis was trying to fill a similar position for one of BioPoint's clients.  A BioPoint recruiter recommended a consultant for the position Attis was trying to fill, but Attis told the recruiter that the consultant did not work out.  Upon information and belief, Attis shared this consultant's information with Dickhaut, who had the same background as that listed in the Vedanta job description, and a month later, Catapult placed this consultant at Vedanta.

56.     Upon information and belief, in or around September 2019, the consultant referenced in Paragraph 55 was let go by Vedanta, and Attis used BioPoint's resources again to help Dickhaut and Catapult fill Vedanta's newly opened position.

57.     Specifically, in or around September 2019, Attis was allegedly trying to place a consultant with one of BioPoint's existing clients.

B5086757.4

58.     Attis expressed reservations about this consultant to BioPoint.  This seemed unusual to BioPoint, since this consultant had a unique skill set, which would be difficult to find again for this client.

59.     Attis arranged an interview for this consultant with BioPoint's client.

60.     Shortly before the interview was to take place, this consultant contacted BioPoint to withdraw her candidacy and to confirm that she had accepted a different position with Catapult at Vedanta.

61.     After this consultant cancelled her interview, Attis revealed to BioPoint that Attis had been sharing BioPoint's information with Dickhaut.

62.     As a result of Attis giving Dickhaut and Catapult this lead, BioPoint lost out on a valuable opportunity.  BioPoint estimates that this contract would have been worth $5,000/week for 6-12 months.

### BioPoint Terminates Attis's Employment

63.     On or around December 4, 2019, BioPoint terminated Attis's employment.

64.     BioPoint provided Attis a letter reminding her of her ongoing obligations under the Agreement and requested that she certify in writing that she has returned all confidential information belonging to BioPoint in her possession.

65.     Attis never provided this certification, and she has not returned any information since her termination.

66.     On January 16, 2020, Attis received an email from one of BioPoint's potential customers that showed a partial conversation indicating that she contacted this potential customer following her termination.  Upon information and belief, Attis has been soliciting BioPoint's potential customers and engaging in business competitive with BioPoint since her termination.

11

## COUNT I
**(Against Attis)**
*Breach of Contract*

67.     BioPoint re-alleges and incorporates by reference paragraphs 1 through 66 of this Complaint.

68.     Attis and BioPoint are parties to a valid contract in the form of the Agreement.

69.     The Agreement by its terms is supported by valid consideration, including, without limitation, Attis's continued employment.

70.     At all times prior to Attis's breach of the contract, BioPoint continued to perform its obligations under the contract, including without limitation continuing to employ Attis.

71.     Attis breached the Agreement by, among other things, disclosing BioPoint's confidential information as contained on Crelate and other locations; assisting Dickhaut and Catapult in placing consultants on behalf of Catapult and securing Catapult's MSP contract with Vedanta, thereby competing with BioPoint; rejecting, willfully ignoring, and/or sabotaging valuable opportunities made available to BioPoint through her; failing to return confidential information at the end of her employment with BioPoint; failing to certify that has returned BioPoint's confidential information; and soliciting and engaging in business competitive to BioPoint following her termination.

72.     BioPoint has suffered harm as a result of these lost opportunities, including without limitation lost revenue and profits from placement contracts.

## COUNT II
**(Against Attis, Dickhaut, and Catapult)**
*Misappropriation of Trade Secrets in violation of M.G.L. c. 93 § 42*

73.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 72 of this Complaint.

B5086757.4

74.     Through her employment with BioPoint, Attis had access to BioPoint's confidential information, including without limitation account lists, service pricing information, contract terms with clients and consultants, consultant tracking history and data on Crelate, and other such forms of information that are not publicly available.

75.     BioPoint has taken great efforts to guard this information and keep it secret.  In particular, it has restricted this access to only employees and required employees with access to this information to sign non-disclosure agreements and restrictive covenants.

76.     BioPoint has also expended significant time and expense in developing and maintaining its client and consultant data.  This information is highly valuable to BioPoint and integral to its competitive advantage in the market.

77.     BioPoint's confidential information thus constitute trade secrets within the meaning of the Massachusetts Uniform Trade Secrets Act (M.G.L. c. 93 §§ 42-42G).

78.     Attis misappropriated BioPoint's trade secrets by sharing that information – including but not limited to confidential information from Crelate – with her fiancé, Dickhaut, and his employer, Catapult.

79.     Dickhaut and Catapult knew or had reason to know that Attis misappropriated that information from BioPoint.  Nevertheless, Dickhaut and Catapult used this confidential information to their advantage, including by successfully placing consultants BioPoint had sought to place with its clients.

80.     As a result of Attis's, Dickhaut's, and Catapult's misappropriation, BioPoint has been harmed.

81.     BioPoint is entitled to actual damages pursuant to M.G.L. c. 93, § 42B.

82.     Attis's conduct was willful and/or malicious, entitling BioPoint to exemplary damages pursuant to M.G.L. c. 93 § 42B(b).

## COUNT III
### (Against Attis, Dickhaut, and Catapult)
*Misappropriation of Trade Secrets in violation of 18 U.S.C. §§1831-39*

83.     BioPoint re-alleges and incorporates by reference paragraphs 1 through 82 of this Complaint.

84.     BioPoint's confidential information, as described above, is related to interstate commerce, as BioPoint and its clients conduct business across state lines, and thus constitute trade secrets within the meaning of the Defend Trade Secrets Act (18 USC §§ 1831-39).

85.     Attis misappropriated BioPoint's trade secrets by sharing that information – including but not limited to confidential information from Crelate – with her fiancé, Dickhaut, and his employer, Catapult.

86.     Dickhaut and Catapult knew or had reason to know that Attis misappropriated that information from BioPoint.  Nevertheless, Dickhaut and Catapult used this confidential information to their advantage, including by successfully placing consultants BioPoint had sought to place with its clients.

87.     As a result of Attis's, Dickhaut's, and Catapult's misappropriation, BioPoint has been harmed.

88.     BioPoint is entitled to actual damages pursuant to 18 USC §1836(b)(3)(B).

89.     Attis's conduct was willful and/or malicious, entitling BioPoint to exemplary damages pursuant to 18 USC §1836(b)(3)(C).

## COUNT IV
### (Against Attis)
*Breach of Duty of Loyalty*

14

90.     BioPoint re-alleges and incorporates by reference paragraphs 1 through 89 of this Complaint.

91.     Attis occupied a position of trust and confidence while employed at BioPoint. Attis was aware that BioPoint was placing its trust and confidence in her to maintain BioPoint's client relationships and the confidentiality of key business, client, and consultant information.

92.     Attis owed BioPoint a duty of loyalty.

93.     Attis breached this duty of loyalty when she shared BioPoint's confidential information with Dickhaut and Catapult, a competitor of BioPoint, and when she provided assistance to them in soliciting BioPoint's present and prospective clients and consultants.

94.     BioPoint has been harmed by Attis's breach of loyalty because BioPoint has lost placements and clients as a result of Attis's assistance of Dickhaut and Catapult's solicitations.

<u>**COUNT V**</u>
**(Against Attis, Dickhaut, and Catapult)**
*Tortious Interference with Prospective Relationships*

95.     BioPoint re-alleges and incorporates by reference paragraphs 1 through 94 of this Complaint.

96.     BioPoint had prospective relationships with various clients and consultants that it was pursuing, including without limitation a client relationship with Vedanta and a placement of a consultant at a client in November 2019.  These relationships were likely to be very profitable for BioPoint.

97.     Attis interfered with BioPoint's prospective relationships with these clients and consultants through improper motive or means by refusing to pursue these opportunities; actively discouraging others at BioPoint from doing so; and using BioPoint's misappropriated

B5086757.4

confidential information to assist its competitor, Catapult, in usurping and obtaining these prospective relationships for itself, all while she was still employed at BioPoint.

98.     Dickhaut and Catapult likewise interfered with BioPoint's prospective relationships by using BioPoint's misappropriated confidential information to obtain these prospective relationships for Catapult.

99.     BioPoint has suffered a loss as a direct result of Attis's, Dickhaut's, and Catapult's conduct.

**COUNT VI**
**(Against Dickhaut, and Catapult)**
*Unfair and Deceptive Trade Practices in violation of M.G.L. c. 93A §11)*

100.     BioPoint re-alleges and incorporates by reference paragraphs 1 through 99 of this Complaint.

101.     BioPoint, Dickhaut, and Catapult are engaged in trade or commerce.

102.     Dickhaut and Catapult committed unfair and deceptive acts toward BioPoint, including their tortious interference with BioPoint's prospective business relationships and their misappropriation of BioPoint's confidential information and/or trade secrets, in violation of M.G.L. c. 93A §11.

103.     Dickhaut and Catapult's unfair and deceptive acts occurred primarily and substantially in Massachusetts, including because Dickhaut resides in Massachusetts, and because Dickhaut and Catapult tortiously interfered with BioPoint's Massachusetts business with its clients and consultants.

104.     As a direct and proximate result of Dickhaut's, and Catapult's, unfair and deceptive business practices, BioPoint has suffered harm and is entitled to all damages authorized by Mass. Gen. Laws ch. 93A, § 11.

16

## REQUEST FOR RELIEF

Wherefore, Plaintiff BioPoint, Inc. respectfully requests that this Court grant the following relief:

     A.  Enter judgment for BioPoint against Defendants on all counts of this Complaint;

     B.  Award BioPoint damages in an amount to be determined at trial;

     C.  Award BioPoint attorneys' fees, costs, and expenses in this action;

     D.  Enter an order for expedited discovery; and

     E.  Grant any such other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff BioPoint demands a trial by jury on all claims so triable.

BIOPOINT, INC.,

By its Attorneys

/s/*James W. Bucking*
James W. Bucking (BBO#558800)
Allison L. Anderson (BBO#687662)
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
617 832 1000
jbucking@foleyhoag.com
alanderson@foleyhoag.com

Dated:  January 24, 2020

17

B5086757.4

## **CERTIFICATE OF SERVICE**

I certify that on January 24, 2020, the foregoing document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent by U.S. mail to those indicated as non- registered participants including the defendants at the address listed below:

Leah Attis
23 Mountain View Road
Leominster, MA 01453

Andrew Dickhaut
23 Mountain View Road
Leominster, MA 01453

Catapult Staffing LLC d/b/a Catapult Solutions Group
92 Montvale Ave., Ste. 4750
Stoneham, MA 02180

/s/ *Allison L. Anderson*

B5086757.4

# EXHIBIT A



Phone: (781) 218-3790
401 Edgewater Place Ste. 130, Wakefield, MA 01880 http://www.biopointinc.com

### BioPoint, Inc.

## NON-SOLICITATION, NON-COMPETITION AND CONFIDENTIALITY AGREEMENT

AGREEMENT made this 29th day of May, 2015 by and between BioPoint, Inc., a Massachusetts corporation (hereinafter referred to as the "Company") and Leah Attis an individual residing 51 Belair Heights, Leominster, MA 01453 (hereinafter referred to as the "Employee").

WHEREAS, the Company is engaged primarily in the recruiting and placement of applicants on a temporary and permanent basis; and

WHEREAS, the Company is in the process of developing a significant reputation and substantial goodwill specifically in the Life Sciences industry (Pharmaceutical, Biotechnology, and Medical Device organizations) through repeated dealings with its customers and as the result of marketing efforts, referrals, advertising and the like in order to repeatedly deal with such customers from year to year as well as to attract new customers; and

WHEREAS, the Employee will be or is employed by the Company in a capacity in which Employee will provide services to the Company's customers and/or in which Employee will become familiar with the Company's proprietary and confidential information, and the Company desires to employ the Employee, subject to the terms and conditions of this Agreement; and

WHEREAS, the Employee desires to initiate or continue employment with the Company and to receive all of the benefits pertinent to such employment upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Employee hereby covenant and agree as follows:

1. **Confidential Information.**

1.1     Employee hereby acknowledges the following:

    (a)    That the Company possesses certain confidential and proprietary information including, but not limited to, information concerning: general business operations; applicants; applicant information; applicant contact information; client information; client contact information; placement opportunities with clients; placement files; recruiting procedures and information; card files; company internal forms; advertising contracts; internal employee lists; computerized databases of applicants, clients and positions; costs; profits; sales; marketing strategies; methods of doing business, servicing clients, customer relations, and of pricing out and making charge for services; business forms developed by or for the Company; form and content of bids, proposals and contracts; names of suppliers, personnel, customers and potential customers; the Company's internal reporting methods; technical and Company data, all whether in writing, oral or machine-readable form; improvements; software programs, however embodied; and information obtained by or given to the Company about or belonging to its customers, potential customers or other third parties (the foregoing being hereinafter referred to collectively as Confidential Information), all of which is confidential in nature and, by virtue of this Agreement, proprietary in nature.

    (b) That maintaining the confidential and proprietary nature of said Confidential Information is essential to the continued commercial success of the Company's business and that said Confidential Information constitutes valuable and unique assets which provide the Company with a distinct competitive advantage over competing businesses; and

    (c) That Employee's duties pursuant to Employee's employment by the Company necessarily involves full access to the Company's confidential information.

    1.2  In light of the foregoing, Employee agrees that Employee will not disclose, divulge or use in any manner any such Confidential Information except as specifically required in the performance of Employee's duties, and that Employee will not, under any circumstances, communicate any such Confidential Information to anyone not employed by the Company and/or specifically authorized by the Company to receive such Confidential Information. It is expressly agreed that the foregoing restrictions upon use, disclosure or communication of the aforementioned Confidential Information shall be in full force and effect forever and shall survive any termination of the Employee's employment with the Company, whether voluntary or involuntary, and regardless of the reason for or manner of termination. The term "Confidential Information" as used herein and the obligations of Employee as set forth herein shall further include any confidential or proprietary information of the Company's customers, applicants, suppliers or licensees in the event that the Company has undertaken any obligation of confidentiality with regard to such persons, firms or entities. In the event that the Company's employment of Employee is terminated for any reason, whether voluntary or involuntary, and regardless of the reason for or manner of termination, Employee further agrees that Employee will deliver to the Company all originals and all copies in the Employee's possession of any customer lists, applicant lists, supplier lists and any and all documents of any nature containing, evidencing or in any manner relating to any Confidential Information as defined herein and shall not take any such customer lists, supplier lists, applicant lists or other documentation as described herein with Employee upon the termination of employment.  If requested by the Company, the Employee shall certify in writing that the Employee has returned all such Confidential Information to the Company.

2.      <u>Developments</u>.

2.1      During the term of Employee's employment with the Company, Employee shall keep the Company informed of any and all promotional and advertising materials, catalogs, brochures, plans, customer lists, supplier lists, applicant lists, manuals, handbooks, inventions, discoveries, improvements, trade secrets, secret processes and any technology, know-how or intellectual property made or developed by Employee in whole or in part, or conceived of by Employee, alone or with others, which results from any work Employee may do for, or at the request of Employer, or which relates in any way to the business operations, activities, research, investigations or obligations of the Company (collectively, the "Information").

2.2      Employee, and Employee's heirs, assigns and representatives shall assign, transfer and set over, and do hereby assign, transfer and set over, to the Company, and its successors and assigns, all of Employee's and their right, title and interest in and to any and all Information, and any patents, patent applications, copyright, trademarks, tradenames or other intellectual property rights relating thereto, provided or conceived by Employee during the Employee's term of employment with the Company. For purposes of this Section 2, any Information developed, conceived or provided by the Employee within six (6) months after the date of the termination of Employee's employment with the Company hereunder shall be conclusively presumed to have been developed, conceived or provided during the Employee' s term of employment with the Company.

2.3      To the extent the Company deems necessary and desirable to effect the intent of the assignments, transfers and set-overs provided for in Sections 2.1 and 2.2 hereinabove, Employee, and Employee's heirs, assigns and representatives, shall, at the expense of the Company, assist the Company or its nominees to obtain patents, copyrights, trademarks and tradenames or similar rights of protection (including any renewals or continuations thereof) for any and all of the Information in any country or countries throughout the world. Employee, and Employee's heirs, assigns and representatives shall execute and deliver any and all applications, assignments or other instruments necessary or desirable to secure a United States or foreign patent, copyrights, trademarks and tradenames or similar rights of protection (including any renewals or continuations thereof), and to transfer to the Company, upon request, any and all right, title or interest in and to any and all such Information. Employee and Employee's heirs, assigns and representatives shall give the Company, upon request, any and all facts known to Employee or them reflecting such Information with respect to any of the foregoing, including, without limitation, any and all formulae, processes, sketches, drawings, models and figures.

3.      <u>**Restrictive Covenants and Covenant not to Compete.**</u>

3.1      The Employee hereby acknowledges the following:

(a)      Employee acknowledges that Employee is being employed by the Company in a position in which Employee will be expected to independently develop and maintain close relationships with customers and applicants of the Company and that such customer and applicant relationships constitute a significant part of the goodwill of the Company, the preservation of which is essential to the success of the Company, and that the Company has a

legitimate interest in restricting Employee's ability to take advantage of such relationships; and

(b)     That, as the result of the inherently close association between Employee and the Company's customers, clients and applicants with reference to the services provided by the Company to said customers, clients and applicants and knowledge of the Company's methods of customer development and other Confidential Information as described herein, any direct or indirect (i) solicitation by the Employee (other than on behalf of the Company) of certain customers, clients and applicants or (ii) competition by the Employee against the Company would seriously damage the Company's goodwill and the success of its business; and

(c)     That competition with the Company by the Employee while the Confidential Information referred to hereinabove and methods of customer development and recruiting of applicants are fresh in Employee's memory necessarily involve utilizing and disclosing the Company's Confidential Information.

3.2     In light of the foregoing, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Employee, Employee hereby covenants and agrees, that, during the term of the Employee's employment with the Company and for a period of one (1) year immediately following any termination of Employee's employment with the Company, whether voluntary or involuntary, and regardless of the reason for or manner of termination, Employee shall not, alone or with others, directly or indirectly (as owner, stockholder, partner, lender, other investor, director, officer, employee, consultant or in any other capacity of any nature whatsoever):

(a)     Solicit, perform or engage in any business of the same or similar nature to the business of the Company anywhere within the Company Territory as hereinafter defined; or

(b)     Solicit, engage in, perform, divert or accept any business of the same or similar nature to the business of the Company with or from any customer or potential customer of the Company; or

(c)     Induce or attempt to induce any customer of the Company to reduce such customer's business with the Company or divert such customer's business from the Company, by advertising, solicitation or otherwise; or

(d)     Solicit, engage in any business with, place or attempt to place in any position any of the applicants of the Company; or

(e)     Induce, entice away, solicit or in any manner persuade or attempt to persuade any applicant of the Company to terminate or limit said applicant's relationship with the Company; or

(f)     Employ, hire, cause to be employed or hired, entice away, solicit or establish a business with any then current officer, employee, consultant, servant or agent of the Company, or any other person who was employed by the Company within the twelve (12) months immediately prior to such employment or establishment, or in any manner persuade or attempt to persuade any officer, employee, consultant, servant or agent of the Company to leave the employ of the Company; or

4

(g)     Take any action prejudicial to the Company or its business affairs or interests; or

(h)     Assist any person, firm, entity, employer, business associate or member of Employee's family to commit any of the foregoing acts.

3.3     For purposes of the foregoing, the following terms shall have the meanings hereinafter set forth:

(a)     The term "Customer" or "customer" shall mean any person, firm, corporation or other entity, or any parent, subsidiary or affiliate thereof with which the Company has had a contract, engaged in any business with, placed any applicants with or for which the Company has performed any work or services during the twelve (12) months immediately preceding Employee's termination and up to and including the date of Employee's termination;

(b)     The term "potential customer" shall mean any person, firm, corporation or other entity or any parent, subsidiary or affiliate thereof from which the Company has solicited or attempted to solicit any business or to which the Company has submitted any written or oral proposal within the twelve (12) months immediately preceding Employee's termination and up to and including the date of Employee's termination;

(c)     The term "Applicant" (or "applicant") and "Applicants" (or "applicants") shall mean any personnel, including, without limitation, engineers, developers, and professionals recruited and/or placed by the Company in any position on a temporary or permanent basis with any customer within the twelve (12) months immediately preceding Employee' s termination and up to and including the date of Employee' s termination.

(d)     The term "Company Territory" shall mean each and every state or territory in which the Company has conducted, transacted or solicited any business, whether through written or verbal communication, in person or telephonically, within the twelve (12) months immediately preceding the date of Employee's termination and up to and including the date of Employee's termination; The term "Company Territory" shall include, without limitation, each and every state or territory in which Employee has conducted, transacted or solicited any business on behalf of the Company, whether through written or verbal communication, in person or telephonically, within the twelve (12) months immediately preceding the date of Employee' s termination and up to and including the date of Employee' s termination; and

(e)     The phrase a business of the same or similar nature to the business of the Company shall mean the temporary and permanent placement of personnel and professionals and the performance of services which have the same or similar characteristics as, or is competitive with, any services engaged in, performed by or rendered by the Company at the time of the termination of this Agreement and/or within the twelve (12) months immediately preceding such termination and/or services which have been the subject of any solicitation or proposal by the Company within the twelve (12) months immediately preceding such termination.

4.     **Enforcement.**

4.1     The covenants and obligations of the Employee pursuant to this Agreement shall be specifically enforceable in addition to and not in limitation of any other legal or equitable remedies, including money damages, which the Company may have.  Employee recognizes and acknowledges that irreparable injury may result to the Company in its business in the event of any breach by Employee of any covenant or agreement contained herein and, by reason of the foregoing, Employee consents and agrees that in the event of any such breach, the Company shall be entitled, in addition to any other remedies that it may have, including money damages, to an injunction to restrain Employee from committing or continuing any violation of any covenant or agreement set forth herein without the Company being obligated to provide any bond or surety therefor. It is the intent of the parties hereto that this Agreement contains covenants which are valid and enforceable, which are reasonable and necessary to safeguard the interests of the Company and which will be binding upon the Employee. Therefore, in the event that any of the foregoing restrictions are determined to be unreasonable or unenforceable because of the duration of such provision, the area covered thereby or the scope thereof so as to render any of the foregoing covenants unenforceable, then this Agreement shall be interpreted as if such covenants require only a reasonable period from the termination of Company's employment of Employee and apply only to reasonable territories and any court making such determination shall have the power to reduce the duration, area or scope of such provision and/or to delete specific words and phrases ("blue-penciling") and in its reduced or blue-penciled form, such provision shall then be enforceable and shall be enforced. In the event that Employee violates any of the covenants contained herein and the Company is required to seek enforcement of such in any court having jurisdiction thereof, Employee shall be responsible for all reasonable attorney's fees and costs incurred by the Company in the enforcement of any covenants contained herein, in addition to any damages sustained by the Company as the result of said violations.

5.     **No Conflict; Devotion of Efforts.**

5.1  Employee hereby represents and warrants to the Company as follows: (i) Employee is not under any obligation to any person, firm or entity which is inconsistent or in conflict with the terms and conditions of this Agreement or which would in any manner prevent, limit or impair in any way the performance of Employee's obligations hereunder; and (ii) Employee has not disclosed and will not disclose to the Company, nor use for the Company's benefit, any confidential information or trade secrets of any person, firm or entity who was a former employer of the Employee, unless and until such confidential information and trade secrets have become lawfully available to the public or to the Company's industry or unless such disclosure is permitted by agreement with or by the consent of any such former employer.  Employee hereby agrees to indemnify and hold the Company harmless against loss, damage, liability or expense arising from any claim based upon circumstances alleged to be inconsistent with the foregoing representations and warranties.

5.2     While Employee is employed by the Company, Employee covenants that he or she will use his or her best efforts, skills and abilities to perform faithfully all duties assigned to the Employee by the Company and to devote his or her full business time and energies to the business and affairs of the Company.  While the Employee is employed by the Company, the Employee will not undertake any other employment from any person or entity without the prior written consent of the Company and the Employee will not engage in the business of the same or

similar nature to the business of the Company either for himself or herself or for any other third party.

6.    **Assignment.**

6.1    This Agreement is personal as to the Employee and shall not be assignable by the Employee. The Company may assign its rights under this Agreement to any person, firm or corporation (including any affiliate or subsidiary of the Company) which may acquire all or substantially all of the business which is currently conducted by the Company (or which is evolved therefrom and is substantially similar thereto), or which may acquire substantially all of the assets of the Company or with or into which the Company may be consolidated or merged, provided, that any such assignment shall be subject to the express terms and conditions hereof.

7.    **Miscellaneous.**

7.1    Employee understands that his or her obligations under this Agreement will continue in accordance with its express terms regardless of any changes in Employee's title, position, duties, salary, compensation or benefits or other terms and conditions of employment. Employee further understands that any obligations under this Agreement will continue following the termination of Employee's employment regardless of the manner of such termination and will be binding upon Employee's heirs, executors and administrators.

7.2    The titles or headings of the paragraphs of this Agreement are not a part of this Agreement and shall have no effect upon the construction or interpretation of any part thereof. This Agreement shall be interpreted under and construed in accordance with the laws of the Commonwealth of Massachusetts.  Any legal action or proceeding with respect to this Agreement shall be brought solely in the courts of the Commonwealth of Massachusetts.  By execution and delivery of this Agreement, each of the parties hereto accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. If any provision or portion of this Agreement shall to any extent be held invalid or unenforceable in any circumstances, the remainder of this Agreement and the application of such portion or provision of this Agreement to other circumstances shall be valid and enforceable to the fullest extent permitted by law. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and no agreement, representation, warranty, or covenant has been made by either party except as expressly set forth herein. This Agreement shall not be altered, modified, amended or terminated except by a written instrument executed by both parties hereto. No waiver, express or implied, shall constitute a waiver of any other breach of the same or any other covenant, agreement or duty. Nothing contained in this Agreement shall in any manner be deemed to bind the Employee or the Company to any specified period or term of employment and nothing contained in this Agreement shall in any manner be deemed to govern or affect any condition of Employee's employment or other items not specifically mentioned herein. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and permitted assigns.

IN WITNESS WHEREOF, the parties have hereunto executed this Agreement as of the day and year first above written, intending this document to take effect as a sealed instrument.

7

COMPANY:

BioPoint, Inc.

Name: ~~Leah Attis~~ GEORGE KOKOROS

Title: ~~Business Account Manager.~~ PRESIDENT

EMPLOYEE

_____
Signature

_____
Leah Attis.

Print Name