UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10118-RGS

BIOPOINT, INC.

v.

ANDREW DICKHAUT and
CATAPULT STAFFING, LLC d/b/a
CATAPULT SOLUTIONS GROUP

MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT

September 22, 2021

STEARNS, D.J.

In the operative Second Amended Complaint (SAC), plaintiff BioPoint, Inc., a life sciences consulting firm, alleges that defendant Andrew Dickhaut, a Managing Director for defendant and competitor Catapult Staffing, LLC d/b/a Catapult Solutions Group, exploited BioPoint's confidential information suborned from Leah Attis, a former Business Development Manager for BioPoint to whom Dickhaut is now married.[1]  Discovery having been completed, the parties cross-move for summary judgment.

---

[1] Attis, who was also named as a defendant in this case, was dismissed for improper venue – BioPoint's claims against her are required by her employment agreement to be litigated in Massachusetts state court. *See* Dkt # 37.  BioPoint elected to bifurcate the claims and continue the suit against Dickhaut and Catapult in this court. *See* Dkt # 40.

BACKGROUND

BioPoint provides consultant placement services to companies in the life sciences industry. To place a consultant, BioPoint refers potential candidates for a client company's open positions. BioPoint earns a fee if a match is made and the candidate accepts an offer from the company. In May of 2015, BioPoint hired Attis as a Business Development Manager. Attis signed a Nonsolicition, Noncompetition and Confidentiality Agreement, committing, *inter alia*, not to use or share BioPoint's confidential information except in performing her job. During her employment with BioPoint, Attis was engaged to Dickhaut.

Catapult is a competitor of BioPoint providing similar placement services. In April of 2017, Catapult hired Dickhaut as the Managing Director of its Massachusetts office. In or around late 2017, Dickhaut begin soliciting clients for Catapult in the life sciences industry, a new area of business for Catapult. BioPoint alleges that Attis shared its confidential information – including the names of qualified candidates, available positions, and business know-how, such as bill rates and contracts, with Dickhaut, causing BioPoint to lose a number of placement opportunities.

BioPoint terminated Attis on December 4, 2019, and filed this lawsuit on January 21, 2020. BioPoint asserts claims for misappropriation of trade

secrets under state (Count I) and federal law (Count II), tortious interference with its relationships with prospective clients and consultants (Count III), and unfair and deceptive business practices (Count IV) in violation of Mass. Gen. Laws. Ch. 93A, § 11.  Defendants, in turn, by way of counterclaims, accuse BioPoint of tortiously interfering with its client relationship with Vedanta Biosciences, Inc. (Counterclaim Count III) and, reciprocally, for unfair and deceptive business practices (Counterclaim Count IV).[2]

## DISCUSSION

A movant is entitled to summary judgment upon a "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."  *Calero-Cerezo v. U. S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).

*BioPoint's Motion*

Turning first to defendants' counterclaims: To make out a claim for intentional interference with contractual relations, defendants must

---

[2] Defendants voluntarily dismissed with prejudice Counterclaim Counts I and II alleging misappropriation of trade secrets.  *See* Dkt # 85.

3

establish that "(1) [they] had a contract with a third party; (2) [BioPoint] knowingly induced the third party to break that contract; (3) [BioPoint]'s interference, in addition to being intentional, was improper in motive or means; and (4) [defendants] w[ere] harmed by [BioPoint]'s actions." *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). In December of 2018, Catapult became the managed services provider (MSP) overseeing consultant placements for Vedanta. Vedanta terminated the agreement in April of 2020. Defendants identify the filing of this lawsuit, in January of 2020, as the catalyst causing Vedanta to rescind the MSP contract. In defendants' view, because BioPoint's Complaint repeatedly named Vedanta and called out its relationship with Catapult, Vedanta ended the successful working relationship to avoid entanglement in this litigation.

BioPoint asserts, and the court agrees, that defendants have failed to adduce competent evidence that would allow a factfinder to conclude that BioPoint *induced* Vedanta to terminate the contract with Catapult. Defendants offer no evidence that BioPoint ever informed or discussed the matter with Vedanta. At best there is a coincidence of timing between the initiation of this lawsuit and Vedanta's termination of the Catapult agreement, but that is insufficient to carry defendants' burden of proof. Defendants admit that one month prior to BioPoint's filing of the Complaint,

4

Vedanta had reduced Dickhaut's hours by 50% because of an unrelated business slowdown, and that Vedanta had told them that it was terminating the MSP contract to move consultant hiring in-house.

Defendants see skullduggery in Vedanta's decision to reverse course and hire a different outside MSP some months later. Defendants, however, have no first- (or second-) hand knowledge of what motivated Vedanta's decision. *See* Fed. R. Evid. 602 (personal knowledge is a prerequisite for testimony). Absent any real evidence (defendants did not take discovery of Vedanta), defendants' surmise as to Vedanta's motivation in replacing them with another MSP is nothing but speculation and conjecture.[3] Because defendants' unfair and deceptive business claim rests on the same foundation, it too will be dismissed.

---

[3] Defendants rely on *Alnylam Pharms., Inc. v. Dicerna Pharms., Inc.*, 2017 WL 6395719 (Mass. Super. Oct. 23, 2017), to support their position that a plaintiff's lawsuit against a competitor can sustain a counterclaim for tortious interference. That case, however, was decided on a motion to dismiss. Here, to defeat summary judgment (after having had the benefit of discovery), defendants bear "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021), quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). This, defendants have not done.

*Defendants' Motion*

Defendants, for their part, argue that BioPoint (similarly) lacks evidence to support its claims. As to Counts I and II,

> [t]o prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret.

*Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007); *see also Viken Detection Corp. v. Videray Techs. Inc.*, 384 F. Supp. 3d 168, 177 (D. Mass. 2019) ("The standard for misappropriation under [federal law] is substantially similar to that under Massachusetts law."). Defendants contend that BioPoint's asserted "trade secrets" are matters in the public domain. Defendants note that BioPoint has no proprietary interest in the names of consultants or their resumes, that BioPoint does not require the consultants with whom it engages to keep such information confidential, and that, in any event, the information is readily available on public fora such as *LinkedIn* and *Zoom Info* (Internet sites on which consultants frequently advertise their qualifications). Likewise, the names of client companies do not belong to BioPoint, and BioPoint readily shares their identities with consultants and publishes them on public fora. Defendants also maintain

that BioPoint cannot demonstrate that defendants ever made use of its information and, in fact, admitted as much while being deposed.

BioPoint, for its part, rejects defendants' pinched view of its confidential information, which it contends encompasses far more than publicly available names and resumes, and also includes dossiers memorializing direct communications with consultants and clients; internal notes and impressions; reference checks and contracts; and details regarding internal costs, recruiting strategies, and pricing. BioPoint also emphasizes that it takes multiple steps to protect this wider range of information, including the use of a password-protected database, *Crelate*, and other security measures on its computer systems; that it requires employees and consultants to execute confidentiality agreements; and that it maintains a system of remote surveillance to detect anomalous employee conduct.

The court agrees with BioPoint that, for purposes of summary judgment, it has established the existence of an actionable trade secret. "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970). Whether the asserted information constitutes a trade secret

"depends on the conduct of the parties and the nature of the information."

*Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972). There are

> six factors of relevant inquiry: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.*

BioPoint has presented documentary evidence[4] that Attis shared with Dickhaut information, such as a draft supplier agreement including comments reflecting BioPoint's negotiation strategies, *see* Dkt # 99-17, and a commission report including consultant names, bill rates, pay rates, and profit spread, *see* Dkt # 99-26. "Such information would certainly provide any competitor with a meaningful business advantage by enabling it to pilfer business opportunities while avoiding business development costs. No serious argument can be made that [BioPoint] would have otherwise been

---

[4] BioPoint also suggests that because of Attis and Dickhaut's personal relationship, it may be reasonably inferred that they exchanged numerous unmemorialized oral communications involving BioPoint's proprietary information.

willing to share this information freely with competitors." *Ooyala, Inc. v. Dominguez*, 2018 WL 3360759, at *6 (D. Mass. July 10, 2018).

That some consultant and client information may also be found in the public domain does not end the inquiry. BioPoint points to instances where Attis passed specific consultant information and client contacts to Dickhaut. *See, e.g.*, Dkt # 99-13 (consultant contact and resume); Dkt #99-11 (decisionmaker at a client company). "[K]nowing how to search for a certain someone is entirely different from knowing *whom* to search for . . . ." *Ooyala*, 2018 WL 3360759, at *6. There is also evidence of instances where Attis provided candidate names to Dickhaut in response to specific open positions. *See, e.g.*, Dkt # 99-19 ("[Attis] has someone in her network for this"). These disclosures are revealing of BioPoint's professional judgments derived from its own business development and experience. Defendants have not proffered evidence "to suggest that [they] had knowledge of the particular significance of these individuals or their particular contact information prior to, or independent of, the information from [BioPoint], nor that it could have acquired this information without significant time and expense in market research or client development." *Ooyala*, 2018 WL 3360759, at *6.

9

Viewing the record in the light most favorable to BioPoint, a factfinder could infer that over the course of Attis and Dickhaut's respective employment at BioPoint and Catapult, defendants used Attis, and, by extension, her access to BioPoint's information and know-how, as a resource to support the development of their nascent life sciences business. *See, e.g.*, Dkt # 99-10 (Dickhaut responding "[Attis is] is going to look through the database at BioPoint and get some info for us" in response to a consultant inquiry directed to him); Dkt # 99-16 at 3 (Dickhaut "positioned our capability using the Vedanta story and Shire projects I learned from [Attis]"); Dkt # 99-19 ( "[Attis] has someone in her network for" a specific position that Catapult was trying to fill). BioPoint also identifies six consultants that it was attempting to position with clients only to lose out to Dickhaut and Catapult. One candidate was placed by Dickhaut at the very company that first offered BioPoint the same placement opportunity.[5] The remaining five consultants landed at Catapult's client Vedanta. In two cases, circumstantial evidence suggests that Attis provided the candidate consultant's name to Dickhaut.[6]

---

[5] There is no evidence that Attis presented this opportunity to anyone at BioPoint.

[6] In one case, Attis stated in a text to Dickhaut that she had set "2 candidates aside" for his open position. Dkt # 93-41 at LA000232. In another, defendants point to Catapult recruiter Corey Swiniarski as the person who had first identified the candidate consultant. *See* Defs' Br. (Dkt

10

Against this background, the merit of BioPoint's misappropriation claims is a question best reserved for a jury.

Turning to Count III, the summary judgment record also supports BioPoint's claim for tortious interference with advantageous relationships.

> The elements of this tort include: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.

*Am. Priv. Line Servs., Inc. v. E. Microwave, Inc.*, 980 F.2d 33, 36 (1st Cir. 1992), citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815-817 (1990).  Here defendants challenge BioPoint's evidence on the third prong – that defendants acted with either an improper motive or improper means.[7] While the court agrees with defendants that the "[a]dvancement of one's economic interest [] is not an improper motive," *TalentBurst, Inc. v. Collabera, Inc.*, 567 F. Supp. 2d 261, 269 (D. Mass. 2008), misappropriation of confidential information can constitute an improper means, *see People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC*, 2010 WL 1267373, at

---

# 91-1) at 16.  However, Swiniarski testified that he only reached out to the candidate after learning of her through a text message from Dickhaut containing only her name.  *See* Swiniarski Dep. (Dkt # 93-12) at 75.

[7] Defendants do not in their summary judgment motion dispute that they were aware that BioPoint was pursuing an advantageous relationship with some of the same consultants and clients.

11

\*16 (Mass. Super. Mar. 31, 2010) (use of stolen documents to solicit business was improper means); *see also Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 658 (2006) ("Improper means include violation of a statute or common-law precept[.]").  Because BioPoint's fourth claim – unfair and deceptive business practices – derives from its misappropriation and tortious interference claims, it too survives summary judgment.

## ORDER

For the foregoing reasons, BioPoint's motion for summary judgment is ALLOWED, and defendants' motion for summary judgment is DENIED. The Clerk will set the case for trial before a jury within the constraints of the present pandemic.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE