UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10118-RGS

BIOPOINT, INC.

v.

ANDREW DICKHAUT & CATAPULT STAFFING, LLC
D/B/A CATAPULT SOLUTIONS GROUP

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A BENCH TRIAL

April 25, 2023

STEARNS, D.J.

At the conclusion of a June 14-22, 2022 trial, a jury found defendants Andrew Dickhaut and Catapult Staffing, LLC (Catapult) liable for the misappropriation of trade secrets from plaintiff BioPoint, Inc. (BioPoint). Catapult and BioPoint are competitors in the highly lucrative life sciences consultant search market. The jury found that Catapult and Dickhaut had misappropriated trade secrets with respect to three candidate consultants recruited by BioPoint and had tortiously interfered with BioPoint's prospective business relationships with one of those candidates. The jury awarded BioPoint $312,000 on the successful tortious interference claim. The jury also found that Catapult and Dickhaut misappropriated BioPoint's

trade secrets concerning two of its prospective clients, Vedanta and Shire. Following the jury trial, a two-day bench trial was convened on October 18-19, 2022, to try BioPoint's remaining equitable claims for unjust enrichment, violations of the Massachusetts Fair Business Practices Act, Mass. Gen. Laws ch. 93A, and for an award of enhanced damages and attorneys' fees.

## FACTUAL FINDINGS

### *The Parties*

1.     Plaintiff BioPoint is a Massachusetts-based company founded in 2011.  BioPoint is a life sciences consulting firm that recruits consultants and short-term labor for pharmaceutical companies, biopharmaceutical companies, and medical device companies.

2.     Defendant Catapult is a Texas-based company founded in 2013. Catapult opened a Boston office in 2017. Catapult provides consulting services similar to those of BioPoint, though originally not to the life sciences industry.

3.     Defendant Dickhaut is an employee of Catapult.  Dickhaut served as the Managing Director of Catapult's Boston office, which he was hired to

open in April of 2017.  At the time, Dickhaut was engaged to Leah Attis,[1] a BioPoint employee to whom he is now married.

### The Consultant Placement Industry

4.    BioPoint and Catapult identify, recruit, and place qualified candidates with employer clients looking to fill vacancies with consultants hired to perform specialized roles.  If an employer client makes an offer that a consultant accepts, the headhunting firm will charge the employer client a "bill rate" for the consultant's work, a substantial portion of which, termed the "pay rate," is paid to the consultant.  The difference between the bill and pay rates, less certain administrative costs, makes up the recruiting firm's profit.  DeGroot Test., Jury Trial Day 1 Tr. [Dkt # 214] at 108-110, 111-112.

5.    Catapult intended for its Boston office to focus on placements in the technology, light industrial, accounting, and finance industries.  It had little, if any, experience in the fields of life sciences and pharmaceuticals and initially had no plans to use the Boston office to expand into either area.  Dickhaut Test., Jury Trial Day 3 Tr. [Dkt # 216] at 153.  Angelo Salustri, the senior Catapult executive overseeing the Boston office, did not have life

---

[1] Attis is not a named defendant in this case but has a starring role in the events giving rise to the litigation.  Attis was employed as a business development manager at BioPoint from May of 2015 to December of 2019. She now works in a similar position at Catapult.

sciences consulting experience.  Salustri Test., Jury Trial Day 4 Tr. [Dkt # 217] at 102-104.

6.     In 2018, Catapult rethought an entry into the life sciences field. Catapult asserts that it began to place consultants in life sciences positions after Jeff Autenrieth, a friend of Dickhaut's from high school, began working as a talent acquisition consultant at Vedanta, a biotechnology company.  *See* Defs.' Mem. in Supp. of Mot. for Summ. J. [Dkt # 91] at 3.  In June of 2018, Salustri asked Dickhaut to identify life sciences clients that were "realistic[] . . . not hopefully, Pie in the sky, long shot maybes" that Catapult could enroll in thirty to sixty days.  Ex. 108.  A recruiter stated that Catapult employees had to learn about the life sciences industry "on our own" because it "was a new section for us, a new industry for us."  Flynn Test., Jury Trial Day 5 Tr. [Dkt # 218] at 5.

7.     BioPoint, for its part, was conceived as a life sciences staffing firm.  DeGroot Test., Day 1 Jury Tr. at 60-61; Ex. 34.  BioPoint's founders brought years of life sciences consulting experience to the fledgling firm.  *See* DeGroot Test., Jury Trial Day 1 Tr. at 59-61.  For example, BioPoint co-founder Robert DeGroot first began working in the life sciences recruiting industry in 2006.  *Id.*  Co-founder Chris Nash also had about fifteen years of experience in the life sciences staffing industry.  Nash Test., Jury Trial Day 4

Tr. at 170.  BioPoint invested years in building an understanding of the life sciences industry's needs and gaining the trust of consultants and company clients.  DeGroot Test., Jury Trial Day 1 Tr. at 64-65.  It took BioPoint years to build a successful record of making entry-level placements before earning the respect of its life sciences clients with respect to its recommendations of consultants for placements in high-level, more lucrative positions.  *Id.* at 64.  BioPoint built its business from making three placements in its first year to a total of over 200 active placements, involving over eighty clients.  *Id.* at 73-74.

       8.    BioPoint uses an internal database called Crelate to store records of past, current, and prospective employer clients and consultants.  *Id.* at 68.  In compiling consultant information, "a name isn't just a name."  Nash Test., Jury Trial Day 4 Tr. at 175.  The Crelate records include the hourly pay rates that BioPoint establishes for its consultants, the bill rates employer clients will pay BioPoint, BioPoint's impressions of the consultants' skills and abilities and suitability to specific tasks, strategic documents on BioPoint's business operations, and its business proposals.  *Id.*  at 76-77.  Access to BioPoint's Crelate database was limited to BioPoint employees, Attis among them.  *Id.* at 78-79.

9.     The private pricing information of a recruiting firm like BioPoint – how much it will offer a consultant for his or her work and how much it will charge the employer client – is a valuable secret because a competitor could use this information to underbid BioPoint's offers to its client and offer higher pay rates to prospective consultants.  *Id.* at 17-19.   Determining competitive bill and pay rates is an art requiring years of experience in the market.  *Id.* at 17-18.

10.    Speed to market is important to successfully place consultants with employer clients because "it's a race to fill the need."  *Id.* at 15-16. Employer clients will turn to competing firms if a consulting firm cannot immediately fill an open position.  *Id.*  Stealing the information that BioPoint had acquired and stored in Crelate, even if only the names that it had identified as potential candidates for a position, can be akin to "starting a marathon in mile 25."  *Id.* at 16.  This is especially true with respect to high-level consultants for which "there is more demand" than supply.  DeGroot Test., Jury Trial Day 1 Tr. at 71.

### *Attis's Disclosure of BioPoint Information to Dickhaut*

11.    The evidence at trial established that Attis, while hesitant at times, repeatedly disclosed BioPoint's pricing information, candidate information, and internally marked-up client agreements to Dickhaut.  *See,*

6

*e.g.*, Ex. 8 (pricing information); Ex. 78 (pricing information); Ex. 70 (consultant candidate information); Ex. 80 (consultant candidate information); Kokoros Test., Jury Trial Day 4 Tr. at 116-119 (client agreement with BioPoint annotations).

12.     In 2016, prior to Dickhaut's employment at Catapult, Attis asked Dickhaut to introduce her to Autenrieth, at the time a hiring manager at Moderna, with the goal of selling BioPoint's services. Ex. 2. In December of 2017, Autenrieth offered Attis the opportunity to place a BioPoint consultant at Moderna. Attis Test., Jury Trial Day 2 Tr. [Dkt # 215] at 124-127.

13.     In late February of 2018, Autenrieth left Moderna to manage contractor hiring at Vedanta, a biotechnology company focused on developing immunotherapies. Autenrieth Test., Jury Trial Day 5 Tr. at 33-36. Consonant with Autenrieth's move, Attis flagged Vedanta to BioPoint as a potential client. DeGroot Test., Jury Trial Day 1 Tr. at 96.

14.     Autenrieth testified that while Dickhaut and Catapult had little experience with the life sciences industry, he had turned to Catapult for staffing needs because he trusted Dickhaut and because most of the roles Vedanta was looking to fill were "somewhat entry level," a task he felt that Catapult could handle. Autenrieth Test., Jury Trial Day 5 Tr. at 36-37. At

the same time, he did not believe that Catapult had a rich enough consultant network to fill higher-level life sciences positions. *Id.* at 36-37, 56.

15.    In March of 2018, Dickhaut told Salustri that Attis had helped him identify a quality assurance life sciences candidate for Vedanta. Ex. 72; Dickhaut Test., Bench Trial Day 1 Tr. [Dkt # 210] at 49.

16.    In September of 2018, Dickhaut pitched Catapult's managed services provider (MSP) agreement to Vedanta. Under the MSP agreement, Catapult would manage consultant labor contracts for an employer client by either directly making placements or by subcontracting the work to another vendor. Dickhaut insisted that, while he had used BioPoint's information to pitch services to other potential life sciences clients, he did not do so in approaching Vedanta. *See* Dickhaut Test., Bench Trial Day 2 Tr. [Dkt # 211] at 36-37.

17.    In December of 2018, Vedanta agreed to the MSP agreement. Catapult thereby acquired "master vendor status" with Vedanta, meaning that it had the first opportunity to fill vacancies at Vedanta as they became available. *Id.* at 15.

18.    For Dickhaut's first placement under Vedanta's MSP agreement in January of 2019, Attis provided Dickhaut with "a few names" along with BioPoint's pay rate for a consultant in a comparable role and the bill rate for

the client employer.  Ex. 11; Ex. 80.  When Dickhaut requested that Attis provide names directly from BioPoint's Crelate database, Attis told him that sharing BioPoint's information was "shady," saying, "Andrew - I can't give you names from our system.  People have [gone] to jail for that."  Ex. 80.

19.    Around the same time, Attis asked BioPoint's founders whether BioPoint would have an interest in becoming a vendor through Catapult's MSP program.  DeGroot Test., Jury Trial Day 1 Tr. at 96.  The BioPoint founders told her that they were not interested because BioPoint did not work through MSPs and did not want to provide competitors with access to its confidential information.  *Id.* at 98.  Attis was cautioned against sharing any of BioPoint's information with Dickhaut.

20.    Dickhaut called Attis after she had raised with BioPoint the idea of becoming a Catapult vendor, but she did not pick up, texting him that she could not talk openly at her desk.  Ex. 59.  Dickhaut wrote back, noting that he "need[ed] to crush this first month and the quicker [he could] fill roles the better start [his] program [would get] off to."  *Id.*  Attis replied that she wanted to help him but that she could not risk losing her job.  *Id.*

21.    Despite BioPoint's rejection of a working relationship with Catapult, Dickhaut continued to solicit Attis for information about BioPoint's pay rate and placement candidates to facilitate his work with Vedanta.  *See,*

*e.g.*, Attis Test., Jury Trial Day 3 Tr. at 11, 13.  Attis said she would look up BioPoint's pay rates for Dickhaut and discuss with him candidates with whom she was familiar.  *Id.* at 12-15.  In one instance, while assisting Dickhaut, Attis replied, "Next time wait for me to check my system," referring to BioPoint's Crelate database.  Ex. 89; Attis Test., Jury Trial Day 3 Tr. at 17.

22.   Attis continued to supply Dickhaut with BioPoint's confidential information.  In September of 2019, she gave him the name of the hiring manager of one of BioPoint's clients, noting that it would be a great place to recruit consultants for Vedanta.  Attis Test., Jury Trial Day 3 Tr. at 36.  In November of 2019, she provided Dickhaut with the medical monitor bill rates of two consultants whom she was interviewing on behalf of BioPoint.  Ex. 28.

### *Medical Director Placements at Vedanta*

23.   As part of its MSP agreement with Vedanta, Catapult sought to fill a medical director's role in March of 2019.  Dickhaut sent Attis the job description on March 11, 2019, and again on April 9, 2019.  Attis testified that Dickhaut was not having success finding anyone in his network to fill the role.  Attis Test., Jury Trial Day 3 Tr. at 43-44.

24.   In April of 2019, Attis revisited her conversation with BioPoint's founders about working with Catapult through their MSP program to fill the

role, but BioPoint again rejected the offer.  Dickhaut was upset that BioPoint had no interest in working with Catapult on the project.  Attis responded, "I understand if you don't want to work with BioPoint, but I do have those 2 candidates set aside for you."  Ex. 22 at 2.

25.    Later that year, Dickhaut made three successive placements for the medical director's role at Vedanta, each time with a consultant from BioPoint's system supplied by Attis.

26.    First, Catapult placed Chris Da Costa in Vedanta's medical director's role on May 21, 2019.  In March of 2019, BioPoint had been vetting Da Costa for another position and received feedback from a client that Da Costa would be better suited to a clinical development role, as Vedanta's medical director position entailed.   Attis testified that she would have thought of Da Costa as a good fit for this role.  Attis Test., Jury Trial Day 3 Tr. at 42.

27.    Second, Catapult placed Stephen Haworth in the role on July 30, 2019.  Attis had previously vetted Haworth for a BioPoint placement in November of 2018, had noted his clinical experience, and was told by BioPoint founder Chris Nash that BioPoint "should probably keep this guy for a clin dev role."  Ex. 64.

28.   Finally, Catapult placed Candida Fratazzi in the role in November of 2019.  BioPoint had begun working with Shire (another pharmaceutical company) in October of 2019 to fill a medical director role in clinical development.  Gretta Hunt, a recruiter at BioPoint, was on the verge of placing Fratazzi at Shire when Catapult lured her away for the Vedanta opening.  Attis was ultimately responsible for BioPoint's Shire account and discussed with Hunt BioPoint's efforts to place Fratazzi. *See, e.g.*, Ex. 25.  In late October, Fratazzi expressed to Hunt concerns of a potential conflict of interest issue,[2] which Hunt relayed to Attis on October 22, 2019. *Id.*  Fratazzi withdrew from consideration for the Shire job on October 25, 2019.

29.   On October 23, 2019, Dickhaut texted a Catapult recruiter, Corey Swiniarski, with the name "Candida Fratazzi MD" with no other comment.  Ex. 20; Ex. 122 at 10 (Catapult's interrogatory noting that Catapult had become aware of Fratazzi on or about October 23, 2019).  Swiniarski reached out to Fratazzi on LinkedIn twenty minutes later.  Ex. 20; Ex. 30.

30.   On November 5, 2019, Fratazzi reached back to Hunt and said she had changed her mind and would like to pursue the Shire role.  BioPoint

---

[2] At the time, Takeda Pharmaceuticals was in the process of acquiring Shire.  Fratazzi was also interviewing for a role at Takeda and was initially concerned about whether she would be working on Takeda products in the Shire role.

submitted Fratazzi's name to Shire, offering Fratazzi a pay rate of $250 an hour and Shire a bill rate of $400 an hour.  Hunt Test., Jury Trial Day 2 Tr. at 54.

31.   On November 18, 2019, Dickhaut texted Attis for Takeda's bill rates.  Ex. 28.  Attis responded that she was driving and could not then provide the rates via text.  *Id.*

32.   On November 21, 2019, Fratazzi told Hunt that she was dropping out of BioPoint's process because she had accepted another opportunity. Hunt Test., Jury Trial Day 2 Tr. at 48.

33.   Hunt observed that Attis appeared panicked by the news that Fratazzi had dropped out of BioPoint's placement process, acting distraught and "kind of funny."  Hunt testified that Attis knew Fratazzi was working with Catapult because Dickhaut had asked her for a backdoor reference.  *Id.* at 56-57.

34.   On the same day, Dickhaut texted Swiniarski that Fratazzi had "canceled her interview at Shire," which was "for Leah."  Ex. 20.  Swiniarski responded, "Gulp," to which Dickhaut responded "Hahahahaha[.] We win!" *Id.*

35.    Catapult placed Fratazzi at Vedanta for a pay rate of $300 an hour and a bill rate of $350 an hour, paying $50 dollars more an hour to Fratazzi than her offer from BioPoint.  Ex. 134.

36.    After learning that Dickhaut had placed Fratazzi at Vedanta using confidential BioPoint information obtained from Attis, BioPoint terminated Attis on December 4, 2019.  DeGroot Test., Jury Trial Day 1 Tr. at 102-104.  Attis now works at Catapult as Director of Life Sciences.  *Id.*

37.    After Attis was terminated by BioPoint, Catapult did not make any additional life sciences placements at Vedanta.  Dickhaut Test., Jury Trial Day 4 Tr. at 6.

### *Discovery Disputes*

38.    During discovery, BioPoint requested that Catapult provide information and documents about the number of life sciences consultants it had placed with Vedanta and the revenue and profits it earned for each placement.  Pl.'s Second Set of Interrogs. [Dkt # 178-1] at 6-7; Pl.'s Am. Second Set of Reqs. for Doc. Produc. [Dkt # 178-1] at 9.  Catapult initially refused to answer BioPoint's interrogatories and document requests.  Def.'s Resp. to Pl.'s Second Set of Interrogs. [Dkt # 178-3] at 4-5; Def.'s Resp. to Pl.'s Am. Second Set of Reqs. for Doc. Produc. [Dkt # 178-4] at 15-16.  It later supplemented its responses with the following:

Vedanta:

. . .

5. Catapult has placed and/or attempted to place approximately 42 life sciences consultants at Vedanta.

6. Catapult's revenue from the Vedanta relationship is approximately $8,500,068 to date.

7. Catapult's profit from the Vedanta relationship is approximately $1,375,148 to date.

. . .

2c. Chris Da Costa

. . .

5. Catapult derived approximately $130,000 in revenue and $23,920 in profit as a result of Mr. Da Costa's placement at Vedanta.

. . .

2g. Candida Fratazzi

. . .

5. Catapult has derived approximately $411,600 in revenue and $52,356 in profit, to date, as a result of Ms. Fratazzi's placement at Vedanta.

. . .

2j. Stephen Haworth

. . .

4. Catapult derived approximately $177,000 in revenue and $41,595 in profit as a result of Mr. Haworth's placement at Vedanta.

Def.s' Second Supp. Resp. to Pl.'s Second Set of Interrogs. [Dkt # 178-6] at 5, 9-12.

## *Jury Trial*

39.   After six days of trial, the jury found that Catapult and Dickhaut had misappropriated BioPoint's trade secrets regarding Fratazzi, Haworth, Da Costa, Vedanta, and Shire/Takeda, and had tortiously interfered with BioPoint's business relationship with Fratazzi.  Jury Verdict [Dkt # 169].

15

40.   The jury awarded BioPoint $312,000 in lost profits stemming from defendants' conduct with respect to Fratazzi.  *Id.*

41.   Following the jury's finding, Catapult provided an itemized list of profits it had earned from Vedanta with respect to each of the named consultants, with deductions for commissions paid to its employees.   In setting the subsequent bench trial, the court held that damages evidence would be "limited to information disclosed and exchanged during discovery." 8/08/2022 Order [Dkt # 198].

## RULINGS OF LAW

### *Unjust Enrichment*

42.   "The traditional form of restitutionary relief in an action for the appropriation of a trade secret is an accounting of the defendant's profits . . . attributable to the use of the trade secret."   Restatement (Third): Unfair Competition § 45, cmt. f (Am. Law. Inst. 1995).   The plaintiff bears the burden of proving defendant's profits attributable to the use of the trade secrets.  *Id.*

43.   An award of unjust enrichment need not be calculated with "mathematical exactness," but the plaintiff must provide a "sufficient foundation for a rational conclusion."   *Id.*   In addition to profits earned directly from misuse of the trade secret, defendant's unjust gain may also

include ancillary profits that were indirectly realized through the defendant's wrongful appropriation. *Id.* (profits on spare parts and service may be included in an accounting of unjust enrichment to the extent that those profits were made possible by defendant's sale of a product embodying a misappropriated trade secret).

44.   The unjust enrichment "attributable" to trade secret misappropriation is distinct from the issue of whether a defendant appropriated a trade secret. Catapult's use of BioPoint's trade secrets has already been determined by the jury. *See Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007) ("To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire *and use* the trade secret.") (emphasis added); *see also* Jury Day 5 Tr. at 161-162 ("To prevail on its trade secret claim, BioPoint must prove by a preponderance of the evidence . . . [t]hat Catapult misappropriated and used this secret information without BioPoint's permission.").

45.   One theory of unjust enrichment is a plaintiff's trade secret giving a defendant a head start. To establish that a misappropriated trade

secret gave a defendant a head start, plaintiff must proffer evidence "(1) that the alleged misappropriation gave [defendant] a head start and (2) that the head start helped to bring about certain earnings over the following months or years." *Alifax Holding Spa v. Alcor Sci. Inc.*, 2021 WL 3911258, at *1 (D.R.I. Sept. 1, 2021).

### *Setoff Amount*

46.     Defendants bear the burden of demonstrating that costs should be offset against the profits Catapult earned from its Vedanta account. *Specialized Tech. Res., Inc. v. JPS Elastomerics Corp.*, 2011 WL 1366584, at *1 (Mass. Super. Ct. Feb. 10, 2011) ("The plaintiff bears the burden of demonstrating that JPS profited from the sale of products produced by the improper use of the trade secret.  Once established, it is the defendant's burden to demonstrate what costs should be properly offset against gross profits, as well as what portion of the profits are attributable to factors other than the misuse of the trade secret."), citing *USM Corp. v. Marson Fastener Corp.*, 392 Mass. 334, 337 (1984); *USM Corp.*, 392 Mass. at 338 ("If a defendant cannot meet its burden as to costs and profits, the defendant must suffer the consequences. . . . Of course, such a process may result in the plaintiff's recovering far more than its actual loss.").

47.     The Federal Rules of Civil Procedure bar the use of evidence not disclosed in discovery.  Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

## Chapter 93A

48.     To determine whether conduct violates Chapter 93A, the court considers "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass 593, 596 (1975).

49.     The court has discretion whether to apply a jury's factual findings to a Chapter 93A claim or whether to ask the jury for a non-binding advisory opinion with respect to the chapter 93A claim.  *See Bero v. Ill. Tool Works, Inc.*, 2002 WL 33730949, at *1 (D. Mass. July, 30, 2002) (a "trial judge has the option of allowing the jury to find the facts on all claims tried, reserving for his decision all aspects of the 93A claim, or of asking for an advisory with

respect to the c. 93A claim"), citing *Int'l Totalizing Sys., Inc. v. PepsiCo., Inc.*, 29 Mass. App. Ct. 424, 435-436 (1990).

50.     While the judge is "free to make findings that may vary from those of the jury," the First Circuit has noted that "the problem is unlikely to arise because 'where a chapter 93A decision follows the jury's resolution of a common-law claim, there will rarely be inconsistent findings as between the jury and the judge because of the unique findings required from the judge.'" *Bero*, 2002 WL 33730949, at *2, quoting *Troy v. Bay State. Comp. Grp.*, 141 F.3d 378, 383 n.3 (1st Cir. 1998); *see also Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987) (finding that the district court was not required to make specific findings of fact as to a Chapter 93A claim where the jury verdict "resolved all material, factual issues relating to the 93A claim.").

51.     A finding of trade secret misappropriation is also sufficient to establish an unfair or deceptive act under Chapter 93A.  *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005) ("Under Massachusetts law, misappropriation of trade secrets alone can constitute a violation of Chapter 93A."); *see also Prescott v. Morton Int'l, Inc.*, 769 F. Supp. 404, 407 (D. Mass. 1990) ("The standards for finding misappropriation of a trade secret provide the criteria for finding an unfair

or deceptive act."); *Juncker Assocs. & Co. v. Enes*, 2002 WL 31104013, at *4 (Mass. Sup. Ct. Sept. 5, 2002) (same).  The same is true with respect to a jury's finding of tortious interference.  *See People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC*, 2010 WL 1267373, at *18 (Mass. Super. Ct. Mar. 31, 2010) ("Topdot's actions constituted a tortious interference with an advantageous business relationship.  Thus, Topdot's actions were within a concept of unfairness established at common-law.  For this reason, the court concludes that Topdot's actions merit relief under [Mass. Gen. Laws ch.] 93A, § 11.").

52.   The court finds that the jury's verdict amply supports a determination that Catapult violated Chapter 93A and that no further findings of fact on this issue are required.

53.   Vicarious liability applies in a Chapter 93A context when an agent's acts taken in service of or for the benefit of the corporation fall within the scope of his or her employment.  *See Wang Lab'ys, Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859 (1986); *Dias v. Brigham Med. Ass'n, Inc.*, 438 Mass. 317, 319-320 (2002) (same).  A master need not be aware of its agent's unfair or deceptive acts to be held vicariously liable.  *See Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, 672 (1996) ("Vicarious liability may be imposed by either of the two routes that we have set out above[,] . . . [n]either

route contains a requirement of awareness or personal involvement by the person held vicariously liable.").

54.    These vicarious liability principles also apply when multiple damages are at issue.   *Id.* at 673 ("[O]ur cases have routinely held corporations liable for multiple damages because of the knowing and wilful acts of their agents.").

### Enhanced Damages

55.    If the Chapter 93A violation was committed willfully or knowingly, plaintiff's "recovery shall be . . . up to three, but no less than two times [the amount of actual damages]."  Mass. Gen. Laws ch. 93A § 11.

56.    Willfulness "implies not only intent to do an act, but also intent that the act be unfair or deceptive."  *Juncker*, 2002 WL 31104013, at *4 n.4. Knowing violations occur "where a defendant is aware that his act is unfair or deceptive or will cause such a result."  *Labouef v. St. Laurent*, 2010 WL 3328012, at *2 (Mass. Super. Ct. July 28, 2010).

57.    A plaintiff must prove that defendant had a "subjectively culpable state of mind" to establish a willful or knowing violation.  *Pro. Servs. Grp. v. Town of Rockland*, 515 F. Supp. 2d 179, 197 (D. Mass. 2007), quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475 (1991).

***Attorneys' Fees***

58.    Reasonable attorneys' fees are automatically awarded when a plaintiff prevails on Chapter 93A Section 2 claims.  Mass. Gen. Laws ch. 93A § 11 ("If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."); *see also Specialized Tech. Res.*, 2011 WL 1366584, at *9 ("G.L. c. 93A, § 11 provides for the award of reasonable attorney's fees and costs wherever there has been a violation of § 2.").

## ULTIMATE FINDINGS OF FACT AND RULINGS OF LAW

59.    Consistent with the jury's verdict, the court finds that defendants misappropriated BioPoint's confidential trade secret information with respect to Vedanta, Shire, Candida Fratazzi, Stephen Haworth, and Chris Da Costa.

60.    Defendants' misappropriation of these trade secrets gave Catapult a head start in developing a working relationship with Vedanta, enabling it to obtain the MSP agreement.

61.    In March of 2018, Attis not only assisted Dickhaut with his search method for locating the candidate who was to become Catapult's first

life sciences placement at Vedanta, but she also ran searches for prospective candidates herself.

62.    In September of 2018, Dickhaut presented Vedanta with the offer of Catapult's MSP services.  Although Dickhaut testified at trial that he did not use BioPoint's information to pitch Vedanta, the court does not find his testimony credible, particularly considering his admission that he used Attis's information to pitch other life sciences companies in 2018.

63.    Even after the MSP agreement with Vedanta was in place, Attis continued to supply Dickhaut with confidential information, including suggested names for Dickhaut's first placement under the MSP agreement, BioPoint's pay and bill rates for comparable roles, and a referral to a BioPoint client from which he could recruit Vedanta consultants.  The evidence permits the fair inference that Attis extracted information to pass along to Dickhaut from BioPoint's Crelate database.  Ex. 89; Attis Test., Jury Trial Day 3 Tr. at 17.

64.    The evidence at trial as confirmed by the jury's verdict also establishes that Attis identified for Dickhaut the names of his three medical director placements – Da Costa, Haworth, and Fratazzi – all of whom were

potential BioPoint clients. *See, e.g.*, Ex. 22 at 2 ("I do have those 2 candidates set aside for you.")[3]; *see also* Ex. 19; Ex. 64.

65.   Attis disclosed to Dickhaut Fratazzi's name, who was then in discussions with BioPoint about another placement option.  A day after Attis was told that Fratazzi had questions about the role she was considering with BioPoint, Dickhaut forwarded Fratazzi's name to Swiniarski.   Ex. 20. Swiniarski reached out to Fratazzi twenty minutes later.   Ex. 30.   The temporal proximity of Hunt's disclosure to Attis, Dickhaut's text to Swiniarski identifying Fratazzi, and Swiniarski's reaching out to Fratazzi support the jury's implicit finding that Fratazzi's ultimate placement at Vedanta was a direct result of the information supplied to Dickhaut by Attis.

66.   This interpretation is further corroborated by Hunt's account of Attis's conduct after she found out that Dickhaut had placed Fratazzi with Vedanta.  Hunt testified that Attis became panicky and confessed that she knew that Fratazzi had been working with Catapult because Dickhaut had asked her for a backdoor reference.

---

[3] Attis testified that while she had told Dickhaut that she had two candidates set aside for him, she actually had only one candidate, Joe Warnocky.  Attis Test., Bench Trial Day 1 Tr. at 127-128; Ex. 21.  But this assertion seeks to challenge whether defendants misappropriated BioPoint's trade secrets with respect to Da Costa and Haworth, a fact that the jury has already found adversely to Catapult.

67.   Additionally, the temporal proximity of Dickhaut asking Attis the bill rate for Takeda – the company acquiring Shire – three days before Fratazzi accepted the Vedanta position over the offer from Shire for an incrementally higher pay rate supports the inference that Attis disclosed pricing information to Dickhaut.

68.   That Catapult's Vedanta profits can be attributed to its misappropriation of BioPoint's trade secrets is further supported by the fact that Catapult did not make any further placements at Vedanta after BioPoint terminated Attis.

69.   In sum, Catapult's relationship with Vedanta was facilitated and buoyed by BioPoint's confidential information, which took BioPoint years to cultivate.  Attis assisted Dickhaut with his first life sciences placement at Vedanta and provided pricing information and the names of qualified consultants (namely Da Costa, Haworth, and Fratazzi) to sustain Catapult's relationship with Vedanta.

70.   Catapult's sustained profits with Vedanta were made possible because of BioPoint's trade secret information and therefore amount to unjust enrichment.

71.   The court rejects defendants' argument that Catapult's full profits from its relationship with Vedanta cannot constitute unjust

enrichment because they include earnings from placements for which BioPoint did not make trade secret misappropriation claims. But for the misappropriation of BioPoint's trade secrets, there would have been no ongoing relationship between Catapult and Vedanta. Catapult's entire relationship with Vedanta was enabled and sustained with BioPoint information.

72. Dickhaut at all times was acting within the scope of his employment for the benefit of Catapult.

73. While there is affirmative evidence that Catapult knew of Dickhaut's unfair acts,[4] a finding of knowledge is not required for Catapult to be held liable for Dickhaut's wrongful acts.

74. No setoff is warranted because defendants failed to provide any offset evidence until after the jury's verdict.

---

[4] The record supports the inference that Catapult executives knew of and yet allowed Dickhaut's solicitation of confidential information from Attis. *See, e.g.*, Ex. 72 (Dickhaut emailing Salustri that Attis was helping him with the search for a Vedanta placement); Dickhaut Test., Jury Trial Day 3 Tr. at 165-166 (confirming that Dickhaut stated, "I positioned our capability using the Vedanta story and Shire projects I learned from Leah" in a weekly report to Salustri); Salustri Test., Jury Trial Day 4 Tr. at 79 (Catapult executive stating he had no intention to discipline Dickhaut for his actions with respect to BioPoint).

75.     The court also determines that Catapult and Dickhaut's conduct was unfair and deceptive within the meaning of Chapter 93A.  The court further finds that Dickhaut's collusion with Attis with respect to BioPoint's trade secrets was knowing and willful.   Dickhaut was aware that surreptitiously obtaining BioPoint's confidential information from Attis was illegal because Attis told him as much.   Among other indicia of guilty conscience, Dickhaut texted the boast to Swiniarski that "We win!" when he learned that Fratazzi had cancelled an interview to the detriment of BioPoint after Attis had provided Dickhaut information that ultimately influenced Fratazzi to work through Catapult instead.  Dickhaut's conduct and culpable state of mind is imputable to Catapult as his employer under the long-established principles of vicarious liability.  Consequently, BioPoint will be awarded treble damages jointly against both Dickhaut and Catapult.

76.     Because defendants' conduct violated Chapter 93A, BioPoint is also entitled to reasonable costs and attorneys' fees.

77.     BioPoint's total damage award is $5,061,444, the sum of the unjust enrichment with respect to Vedanta and lost profits for Fratazzi's

placement, enhanced ($4,125,444[5] and $936,000,[6] respectively), plus reasonable attorneys' fees.

## ORDER

The Clerk will enter judgment for BioPoint consistent with the court's and jury's findings and rulings.  BioPoint will have twenty-one (21) days from the date of this Order to submit a bill with supporting documentation for its reasonable costs and attorneys' fees.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[5] This amount represents the court's findings that Catapult's profit from the Vedanta relationship is $1,375,148.  The court then multiplied that finding by three.

[6] This amount is the jury's award for the tortious interference of BioPoint relationship with Fratazzi, $312,000, multiplied by three.